**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| VASILLI KATOPOTHIS and FRANCESCA DAHLGREN,<br><br>         *Plaintiffs*,<br><br>  v.<br><br>WINDSOR-MOUNT JOY MUTUAL INSURANCE COMPANY,<br><br>         *Defendant / Third Party Plaintiff*,<br><br>  and<br><br>R.W. HOME SERVICES, INC. d/b/a GALE FORCE CLEANING AND RESTORATION,<br><br>         *Defendant*,<br><br>  v.<br><br>R.W. HOME SERVICES, INC. d/b/a GALE FORCE CLEANING AND RESTORATION,<br><br>         *Third Party Defendant*. | Civil Action No. 14-380 (RDM) |

## <u>MEMORANDUM OPINION</u>

This case arises from a plumbing accident at the Delaware vacation home of Francesca Dahlgren and her husband Vasilli Katopothis ("Plaintiffs"), who are residents of the District of Columbia.  Dkt. 5-1 at 3.  While Plaintiffs were in the District, a pipe failure flooded their Delaware residence, leading to an infestation of mold and, Plaintiffs say, necessitating the demolition of the home.  They allege losses of more than $800,000.  Dkt. 35 at 6, 12.

Plaintiffs now seek to recover from two defendants.  First, they have sued their home insurance provider, Windsor-Mount Joy Mutual Insurance Co. ("Windsor"), a Pennsylvania corporation with its principal place of business in Pennsylvania.  Dkt. 5-1 at 3.  Plaintiffs claim that Windsor breached their insurance contract by refusing to cover Plaintiffs' loss.  Dkt. 35 at 2–6 (Am. Compl. ¶¶ 5–33).  Second, Plaintiffs have sued the company they hired to mitigate the flood damage, R.W. Home Services, Inc. doing business as Gale Force Cleaning and Restoration ("Gale Force"), which is a Delaware corporation with its principal place of business in Delaware. Dkt. 42-5 at 2 (McCreary Decl. ¶ 2).  Alleging that Gale Force failed adequately to remediate the loss, Plaintiffs assert claims against it for breach of contract, negligence, negligent misrepresentation, and violations of the Delaware Consumer Protection Act.  Dkt. 35 at 7–12 (Am. Compl. ¶¶ 39–72).  In addition, Windsor has filed a third party complaint against Gale Force.  Dkt. 28.  That complaint alleges that, to the extent Windsor is liable to Plaintiffs, it is subrogated to Plaintiffs' claims against Gale Force for breach of contract and negligence claims and that it is also entitled to recover as a matter of common law indemnity and contribution.  *Id.*

Two sets of motions are now before the Court.  First, Plaintiffs and Windsor have filed cross-motions for summary judgment.  Plaintiffs have moved for partial summary judgment against Windsor as to liability—that is, they seek to establish coverage.  Dkt. 36.  Windsor, in turn, has cross-moved for summary judgment, arguing that the policy's "Exclusions for Unoccupied Residences" exclude Plaintiffs' loss from coverage.  Dkt. 46.  Second, Gale Force has moved to dismiss all claims against it for lack of personal jurisdiction, and has moved to dismiss Windsor's subrogation counts for failure to state a claim.  Dkt. 42.  Plaintiffs and Windsor oppose the motion to dismiss for lack of personal jurisdiction and, in the alternative, request leave to conduct additional jurisdictional discovery.  Dkts. 48 & 49.  Windsor further

2

requests that, if personal jurisdiction over Gale Force is lacking, that the Court "vouch-in" Gale Force or transfer the case to Delaware.  Dkt. 48-1 at 7–14.  Finally, Windsor opposes the motion to dismiss the subrogation counts.  *Id.* at 14–18.

For the reasons discussed below, the Court concludes that the insurance policy unambiguously excludes coverage of Plaintiffs' claims.  As a result, Plaintiffs' motion for partial summary judgment will be denied and Windsor's motion for summary judgment will be granted. The Court further concludes that it lacks personal jurisdiction over Gale Force with respect to Plaintiffs' claims against it, and that further jurisdictional discovery is unwarranted.  The Court will therefore transfer the case to the U.S. District Court for the District of Delaware pursuant to 28 U.S.C. § 1406(a).

## I.      BACKGROUND

The following facts are undisputed, except where specifically noted:

In the spring of 2000, Plaintiffs purchased a second home in Rehoboth Beach, Delaware. Dkt. 40-1 (Dahlgren Dep. 23:9–23:15).  They have since used it periodically throughout each year, spending close to forty percent of their time there.  *Id.* at 15:11–15:17.  They spend the remainder of their time in Washington, D.C., where they live and work.  *Id.* at 15:11–15:14, 18:16–18:18; *accord* Dkt. 40-15 (Katopothis Dep. 7:2–7:13).  While Plaintiffs were in the District for a ten-day period in February 2013, a plumbing accident caused significant damage to their Delaware home.  Dkt. 40-1 (Dahlgren Dep. 102:1–103:3).

## A.      The Insurance Policy

Plaintiffs contracted with Windsor to insure the Delaware property on an annual basis starting on June 15, 2000.  Dkt. 40 at 13.  The policy thereafter renewed every year, with the operative policy covering the period between June 15, 2012, and June 15, 2013.  Dkt. 40 at 13–

16.  It consists of two relevant forms: a twenty-seven-page "Special Form," Dkt. 40-21 at 3–27, and a one-page endorsement, labeled "ML-508D (04-06)," *id.* at 30.  Windsor added form ML-508D to the policy in 2004 and then modified it in 2006.  Dkt. 40 at 14–15.

The Special Form defines the policy's rules of coverage, which differ for real and personal property.  For real property, the policy has what is commonly known as an "all risk" structure.  This means that any direct physical damage to the insured building is covered, unless the policy specifically identifies the risk of such loss as an "exclusion."[1]  Dkt. 40-21 at 11.  For personal property, the policy has what is known as a "named peril" structure.  This means that personal property is insured only against risks expressly listed in the policy and, even then, only against risks that are not otherwise excluded.[2]  Dkt. 40-21 at 13–14.  The "accidental discharge or overflow" of water from a plumbing system is a risk to personal property expressly covered by the policy, subject to applicable exclusions.  Dkt. 40-21 at 14.

---

[1]  For real property, the coverage provision states:

> [Windsor] insure[s] property covered under Coverages A [the residence] and B [related private structures] for risks of direct physical loss, unless the loss is excluded under the *Exclusions Applying to Coverages A and B* or under the *Exclusions That Apply To Property Coverages*.

Dkt. 40-21 at 11 (emphasis added).

[2]  For personal property, the coverage provision states:

> [Windsor] insure[s] against direct physical loss to property covered under Coverage C [personal property] caused by the following perils, unless the loss is excluded under the *Exclusions That Apply to Property Coverages*: . . .
>
> > 13.  Accidental Discharge or Overflow of Liquids or Steam from a plumbing, heating, air-conditioning, or automatic fire or protective sprinkling system; water heater; or domestic appliance.

Dkt. 40-21 at 13–14 (emphasis added).

The Special Form also contains three types of exclusions.  They are: (1) exclusions applicable only to real property,[3] *see* Dkt. 40-21 at 12–13; (2) exclusions applicable to both real and personal property, and which are subject to an additional "anti-concurrent causation" clause,[4] *see id.* at 15–16; and (3) exclusions applicable to both real and personal property, and which contain an explicit exception allowing coverage for "ensuing loss[es]," [5] *see id.* at 16–17.  Neither party contends that Plaintiffs' insurance claim falls within any of these Special Form exclusions.

The parties dispute only the proper interpretation of the freestanding ML-580D endorsement, titled "Additional Exclusions for Unoccupied Residences."  *Id.* at 30.  It provides:

---

[3]  The first list of exclusions is labeled "Exclusions Applying to Coverage A [the residence] and B [related private structures]."  It includes no prefatory language.  Dkt. 40-21 at 12–13.

[4]  The second list of exclusions is labeled "EXCLUSIONS THAT APPLY TO PROPERTY COVERAGES."  It includes the following prefatory language:

> [Windsor] do[es] not pay for loss if one or more of the following exclusions apply to the loss, *regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events.*

Dkt. 40-21 at 15 (emphasis added).

[5]  The third list of exclusions is also labeled "EXCLUSIONS THAT APPLY TO PROPERTY COVERAGES."  It includes the following prefatory language:

> [Windsor] do[es] not pay for loss if one or more of the following exclusions apply for the loss.  *However, [Windsor] do[es] pay for an ensuing loss that is otherwise covered by the policy.*

Dkt. 40-21 at 16 (emphasis added).

ML-508D (04-06)

ADDITIONAL EXCLUSIONS FOR UNOCCUPIED RESIDENCES

In addition to exclusions found elsewhere in your policy, if the insured residence is vacant, unoccupied (meaning an absence of 72 hours), or under construction and unoccupied, the Insured must:

  a. Maintain Heat in the residence and shut off the water supply where it enters the residence.  If the residence is heated by a hot water system, the water supply to the heating system must be maintained and the water supply to the rest of the residence must be shut off.
OR
  b. Shut off the water supply where it enters the residence and completely empty liquids from any plumbing, heating, air condition system, water heater, or domestic appliance.

If this is not done, we do not pay for loss caused by freezing of or discharge, leakage, or overflow from any plumbing, heating, or air conditioning system or any appliance or other equipment attached to it.

Dkt. 40-21 at 30.  The Delaware Department of Insurance approved this endorsement, *see* Dkt. 40-22, as required by Delaware law, *see* Del. Code tit. 18, § 2714(a).

The same page on which Windsor printed the endorsement also includes an "important policyholder notice," labeled "WB-27D (07-11)."  *See* Dkt. 40-21 at 30.  Unlike the ML-580D endorsement, the notice was not submitted for regulatory approval, and, as Windsor itself agrees, it is not part of the contract.  Dkt. 40-3 (Underwood Dep. 87:8–88:13).  According to Windsor's corporate designee, Windsor included the notice "to help the insured to realize the provisions of the [ML-508D] exclusion."  *Id.*  The notice that accompanied the operative policy stated:

WB-27D (07-11)

IMPORTANT POLICYHOLDER NOTICE

FAILURE TO FOLLOW THE REQUIREMENTS OF THE POLICY COULD
COST YOU THOUSANDS OF DOLLARS

Be aware that damage from water which escapes from plumbing and heating systems and appliances is a frequent cause of loss and can cause large claims and great damage particularly when the leak goes undetected and the water keeps

running and running for long periods of time.  In the past we have paid water damage claims in excess of $100,000!  There are some simple, common sense steps you can take to minimize these claims and thus save yourself the cost of your deductible and the inconvenience of major damage to your property.  At the same time, in the long run, minimizing claims can keep insurance rates down and protect your insurability.

Please read form ML-508D (04-06) which is a part of your policy and states that if you fail to take one of two steps when the insured property is vacant or unoccupied (meaning an absence in excess of 72 hours) or under construction and unoccupied, you will have no coverage for the kinds of water damage described in the form.  *We interpret "occupancy" to mean that someone stays there overnight.  Other visits to the premises do not constitute "occupancy."*

*If your home does not currently have a means to shut off the water supply where it enters the home or to shut off the water to the rest of the home if you have a heating system which uses water, it is your responsibility to have a plumber accommodate this need.*

Therefore, every time the property is going to be unoccupied for more than three days be sure to take the required measures.

If you have any questions, please contact your agent.

Dkt. 40-21 at 30 (emphasis added).  Windsor included similar notices in the policies covering the years 2006 to 2012, but those notices lacked the italicized language.  Dkt. 40 at 14–15; *see* Dkts. 40-4, 40-5 & 40-6 (previous copies of notice and form ML-580D).

Plaintiffs did not read the ML-580D exclusion or the WB-27D notice until after they submitted the insurance claim that is the subject of this case.  Dkt. 40-1 (Dahlgren Dep. 249:13).

**B.      The Incident**

On February 16, 2013, Francesca Dahlgren returned to her Delaware residence to find water gushing "[like] a waterfall" from a hole in the ceiling, flooding the house with about two inches of water.  Dkt. 40-1 (Dahlgren Dep. 102:1–102:3, 105:19–107:13, 110:5–110:13).  A pressurized water pipe had failed at the joint, causing the leakage and subsequent flooding.  Dkt. 36-1 at 11; Dkt. 40 at 19.  The flooding later resulted in the

proliferation of mold.  Dkt. 36-1 at 11.  In or around May 2013, Plaintiffs demolished the residence and built a new home on the property, Dkt. 40 at 19, allegedly as a result of the water damage and mold infestation, Dkt. 35. at 3 (Am. Compl. ¶ 13).

No person was present at the Delaware property during the six days prior to February 16, 2013.[6]  Dkt. 40-1 (Dahlgren Dep. 102:19–104:8, 198:19–199:8).  The last person at the property had been Plaintiffs' friend Carol McCann, who checked the doors and checked for mail at the house on February 10, but did not go inside.  *Id.*  Plaintiffs themselves were last at the property on February 6, 2013.  *Id.*  Their belongings, however, including food, medicine, and clothing, remained in the house throughout the relevant period.  *Id.* at 198:6–198:14.

Although Plaintiffs did leave the heating system on during their absence, they did not "shut off the water supply where it enters the residence."  Dkt. 40-21 at 30.  Indeed, as Plaintiffs now emphasize, the house "did not have a water supply valve on the main water supply where the water enters the home."  Dkt. 36-1 at 7.  The record discloses only two means by which Plaintiffs could have prevented water from flowing into the house's plumbing: (1) requesting that a city official turn off the water manually, Dkt. 36-13 at 3; or (2) hiring a plumber to install a master shutoff valve for an estimated one-time cost of $815, Dkt. 40-10 at 4.  Plaintiffs took neither step.  Their only actions with respect to the water supply were to shut off "the water supply to the outside shower" and "the water supply to the outside hose," Dkt. 40-1 (Dahlgren Dep. 199:16–199:18)—that is, to prevent water from flowing *out* of the house's plumbing system.  Dahlgren testified

---

[6]  The record before the Court does not reveal exactly when the pipe burst.  Nonetheless, the parties do not dispute that, for purposes of the insurance contract, the "loss" occurred on February 16, 2013.  Dkt. 40 at 19; *see also* Dkt. 35 at 3 (Am. Compl. ¶ 11); Dkt. 36-10 at 2.

that she believed she "did everything within [her] power to secure the house" before

leaving it on February 6, 2013. *Id.* at 199:20–200:1.

### C.      Windsor's Assessment

Plaintiffs timely filed a claim under their policy with Windsor.  Dkt. 1-2 at 6 (Compl.

¶ 22); Dkt. 2-2 at 2 (Answer ¶ 13).  Windsor hired a third-party adjuster, Tim Stapf, to assess the

claim and to investigate the "occupancy of the property prior to the loss."  Dkt. 36-10 at 2;

*accord* Dkt. 36-1 at 11.  According to Windsor's guidelines, third-party adjustors make initial

recommendations as to coverage, but Windsor retains final decisionmaking authority.  Dkt.

40-18 at 2.  Stapf reported to Windsor's in-house adjustor, Cheryl Ackley, who in turn reported

to Windsor's general claims manager, Ed Campbell.  Dkt. 36-1 at 11–12; Dkt. 40-19 (Campbell

Decl. ¶¶ 2, 3); Dkt. 40-20 (Ackley Dep. at 6:13–6:20).

On March 3, 2013, Stapf filed a draft report, Dkt. 36-13, in which he recommended that

Windsor approve Plaintiffs' insurance claim because the house lacked a shutoff valve.  He wrote:

> It is this writer's opinion that coverage would be afforded for this loss, as the
> property was constructed in such a way that restricts your insured from complying
> with the water supply requirements in your ML-508D endorsement.  Simply put, it
> is not logical or reasonable to require your insured to turn off a water supply valve
> that does not exist.

*Id.* at 3.  The report did acknowledge, however, that Plaintiffs could have "compl[ied] with [the

ML-508D] requirement" by "calling the water company and arrang[ing] to have them shut off

the supply line."  *Id.* at 2–3.  (Stapf was unfamiliar with the WB-27(D) notice, recited above,

which referred to the additional possibility that an insured party could have a shutoff valve

installed.)  Dkt. 40-17 (Stapf Dep. 63:15–65:11).  Because Ackley was out of town at the time,

Stapf escalated this "tricky" issue directly to Campbell.  Dkt. 40-20 (Ackley Dep. 87:14–88:7).

The next day, Campbell requested that Stapf change his report to conform to Windsor's standing interpretation of the policy.  Dkt. 36-14.  Campbell explained that "even [in cases in which] the insured has no way in which to shut off a portion of the water supply [and] does not have the system modified to allow this to be done," the policy "is clear" that "we are not to afford coverage for this type of loss."  *Id.* at 2.  He said that Plaintiffs had a "duty" to "realize [that] modifications need[ed] to be done to meet [Windsor's] requirements" and to "contact a qualified plumber" if necessary.  *Id.*  He then added that, although he personally is "not in agreement with the position taken by [Windsor]," he had his "marching orders."  *Id.*  Campbell later testified that he was not commenting on the proper interpretation of the policy, but rather describing his view that Windsor should not sell policies with the ML-508D (04-06) exclusion at all.  Dkt. 40-19 (Campbell Decl. ¶ 6).  Stapf deleted the quoted language from his report, and modified it to opine that Windsor could either grant or deny coverage.  *See* Dkt. 36-15.

When Ackley later returned from vacation, she expressed confusion regarding the status of the claim.  Dkt. 40-20 (Ackley Dep. 90:3–90:16, 91:10–91:15).  She wrote in the case file: "This is the one [where] the [insured] cannot turn off [the] water . . . ???  [H]ow should this one be handled?"  Dkt. 36-13 at 3; Dkt. 40-20 (Ackley Dep. 80:10–81:7).  Upon learning that Campbell had resolved the issue, she added "per [manager,] denial."  Dkt. 36-13 at 3.

On March 11, 2013, Windsor denied Plaintiffs' insurance claim.  Dkt. 36-17.  Windsor cited the ML-508D exclusion as the reason for the denial, but reserved the right to invoke other policy terms that might also preclude coverage.  *Id.* at 3.

**D.**   **Plaintiffs' Contract with Gale Force**

Plaintiffs hired Gale Force to remediate the water damage from the burst pipe.  Dkt. 28 at 2 (Third Party Compl. ¶¶ 4–5); Dkt. 35 at 7 (Am. Compl. ¶ 40).  Gale Force is a Delaware

corporation, with its principle place of business in Delaware.  Dkt. 42-5 at 2 (McCreary Decl.

¶ 2).  The company has no office in the District, has no registered agent in the District, and is not

registered to do business in the District.  *Id.* at 2–3 (¶¶ 3–10).  According to Gale Force's

president and owner, "[n]o employee or representative of Gale Force traveled to the District of

Columbia in connection with services performed or potentially to be performed" at Plaintiffs'

Delaware property; those services occurred exclusively in Delaware.  *Id.* at 3 (¶¶ 11, 12).

Dahlgren first contacted Gale Force's Delaware office by telephone about the potential

remediation effort on February 20, 2013.  Dkt. 53-1 at 2; Dkt. 53-6 at 2.  She apparently placed

the call from her Delaware home.  Dkt. 53 at 5; *see* Dkt. 53-6 at 2 (noting that, at the time of the

call, the customer was "on site").  That same day, representatives from Gale Force met Dahlgren

at her Delaware property, where they entered into a "Work Authorization & Contract for

Emergency Services."  Dkt. 53-1 at 2; *see* Dkt. 42-4.

The contract listed the Delaware property as the "[s]ervice [a]ddress," but listed

Plaintiffs' D.C. home as the "[b]illing [a]ddress."  *Id.*  The top of the contract displayed the

"Gale Force Cleaning & Restoration" logo, as well as the insignia for "1-800-BoardUp"

("BoardUp").  *Id.*  According to the President of Gale Force, BoardUp is "a marketing model"

that "licenses 'territories' to mitigation contractors," and, "if a call is made to 1-800-BoardUp for

services, those services are referred to the contractor services the territory into which the call

comes."  Dkt. 52-7 at 3 (Supp. McCleary Decl. ¶¶ 3-4).  Gale Force "purchased a territory from

1-800-BoardUp and the right to use the name."  *Id*. (¶ 5).  At the relevant time, that territory

included "southern Delaware and part of the eastern shore of Maryland."  *Id.*  If BoardUp

received a call regarding a potential project in the District of Columbia, however, that customer

would have not have been referred to Gale Force and, instead, the call would have gone to

"whatever 1-800-BoardUp licensee had the territory that included" the District.  *Id*.  Plaintiffs, however, appear to dispute this characterization.  *See* Dkt. 49 at 7–8.

Between February 20 and April 30, 2013, Dahlgren spoke on the telephone from the District of Columbia with Gale Force employees in Delaware on nine occasions, for a total of forty-four minutes.  Dkt. 48-1 at 4; *see* Dkt. 48-5 (Dahlgren phone records).  Windsor concludes from the phone records, moreover, that Gale Force initiated four of those calls.  Dkt. 48-1 at 4.  The record also includes evidence that Gale Force engaged in at least two email exchanges with Dahlgren.  On February 22, 2013, Gale Force emailed her a cost estimate, to which she responded on March 20, 2013.  Dkt. 48-11 at 1–2.

Both Windsor and Plaintiffs allege that Gale Force failed adequately to remediate the water damage.  *See* Dkt. 28 at 3 (Third Party Compl. ¶ 7); Dkt. 35 at 7 (Am. Compl. ¶ 42).  According to Windsor, "Gale Force merely installed three dehumidifiers or air removers and left them at the property for over two months, taking no other remedial actions."  Dkt. 28 at 3 (Third Party Compl. ¶ 7).  This failure allegedly caused mold to proliferate across the residence, which Plaintiffs contend necessitated the demolition of the house.  Dkt. 35 at 4 (Am. Compl. ¶ 15).

## II.    STANDARD OF REVIEW

Two different legal standards govern the Court's consideration of the pending motions.

First, Plaintiffs have moved for partial summary judgment, and Windsor has cross-moved for summary judgment.  Summary judgment is appropriately granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895–96 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the outcome of the litigation.  *Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433

F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."  Fed. R. Civ. P. 56(c)(1)(A).

The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified." *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987).  When a motion for summary judgment is under consideration, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. Pepco*, 447 F.3d 843, 850 (D.C. Cir. 2006).  The non-movant's opposition, however, must consist of more than allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The non-movant must provide evidence that would permit a reasonable jury to find in its favor. *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  If his evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249–50.

Second, Gale Force has moved under Rule 12(b)(1) to dismiss for lack of personal jurisdiction.  On such a motion, the plaintiffs "[bear] the burden of establishing a factual basis for the exercise of personal jurisdiction" over each defendant. *Crane v. N.Y. Zoological Soc.*, 894 F.2d 454, 456 (D.C. Cir. 1990).  To do so, plaintiffs "must allege specific acts connecting [the] defendant with the forum" and "cannot rely on conclusory allegations." *Clay v. Blue Hackle N. Am., LLC*, 907 F. Supp. 2d 85, 87 (D.D.C. 2012).  The Court "need not treat all of plaintiffs'

allegations as true" and "may receive and weigh affidavits and any other relevant matter to assist

it in determining the jurisdictional facts." *Id.* Ultimately, the Court must "satisfy itself that it has

jurisdiction to hear the suit," and, to the extent necessary, "may look beyond the allegations of

the complaint" to do so. *Achagzai v. Broad. Bd. of Governors*, 14-cv-768, 2016 WL 1089214, at

*4 (D.D.C. Mar. 18, 2016).

### III.    ANALYSIS

### A.    Plaintiffs' and Windsor's Cross-Motions for Summary Judgment

The pending cross-motions for summary judgment deal exclusively with the proper

construction of form ML-508D, which creates "Additional Exclusions for Unoccupied

Residences." Dkt. 40-21 at 30. The dispute concerns whether form ML-508D's language is

ambiguous. Windsor argues that the relevant language is clear, and that it, in combination with

the undisputed facts, shows unambiguously that Plaintiffs' losses are not covered. Dkt. 40.

Plaintiffs, on the other hand, point to three elements of form ML-508D that they say are

ambiguous: (1) the meaning of "unoccupied"; (2) the meaning of the requirement that Plaintiffs

"shut off the water supply where it enters the residence"; and (3) the scope of the ML-508D

exclusion and, in particular, whether it excludes losses to certain types of property, whether it

excludes "ensuing losses," and whether it employs the "efficient proximate cause" standard of

causation. Dkt. 36-1.

#### 1.    *Choice of Law*

As an initial matter, the parties dispute which jurisdiction's law governs the interpretation

of the insurance policy. Windsor maintains that D.C. law should control. *See* Dkt. 40 at 30–32.

Plaintiffs argue for Delaware law, *see* Dkt. 36-1 at 15, but also contend that the laws of the two jurisdictions are in any event identical, *see* Dkt. 45 at 21.[7]

While sitting in diversity, this Court applies the choice-of-law rules of the District of Columbia. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Under those rules, the Court "must first determine whether there is a conflict between the laws of the relevant jurisdictions." *Eli Lilly & Co. v. Home Ins. Co.*, 764 F.2d 876, 882 (D.C. Cir. 1985) (citing *Fowler v. A & A Co.*, 262 A.2d 344, 348 (D.C. 1970)). If no such conflict exists, no choice-of-law analysis is necessary. *Young Women's Christian Ass'n of the Nat'l Capital Area, Inc. v. Allstate Ins. Co. of Can.*, 275 F.3d 1145, 1150 (D.C. Cir. 2002) (citing *Greycoat Hanover F St. Ltd. P'ship v. Liberty Mut. Ins. Co.*, 657 A.2d 764, 767–68 (D.C. 1995)). And no conflict exists if the laws of the different jurisdictions "would produce the identical result on the facts presented." *USA Waste of Md., Inc. v. Love*, 954 A.2d 1027, 1032 (D.C. 2008).

As explained below, the Court concludes that, even if D.C. and Delaware law are not identical in every relevant respect, they produce identical results in this case. The Court will therefore apply the law of both jurisdictions, without reaching a definitive conclusion regarding which law controls.

### 2. *Principles of Insurance Contract Construction*

Both Delaware and D.C. courts employ a two-step analysis in resolving asserted ambiguities in insurance contracts.

---

[7] Neither party addresses the clause in the policy that arguably specifies that Delaware law controls. Dkt. 40-21 at 27 (Policy Condition ¶ 5); *see Whiting v. AARP*, 637 F.3d 355, 361 (D.C. Cir. 2011) (explaining that D.C. choice-of-law rules call for the enforcement of choice-of-law clauses, provided the contract has "some reasonable relationship with the state specified" (internal quotation mark omitted)); *see also Vaughan v. Nationwide Mut. Ins. Co.*, 702 A.2d 198, 200–02 (D.C. 1997) (enforcing similarly phrased clause in an insurance contract, where the clause referred to the law of the jurisdiction in which the insured property was located).

At the first step, the Court must determine whether the contractual language is, in fact, ambiguous.  Whether contractual language is ambiguous raises a pure question of law.  *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 286 (Del. 2001); *accord Chase v. State Farm Fire & Cas. Co.*, 780 A.2d 1123, 1127 (D.C. 2001).  In both jurisdictions, "[a]mbiguity exists in insurance contracts where the language is reasonably susceptible to at least two different meanings."  *Bermel v. Liberty Mut. Fire Ins. Co.*, 56 A.3d 1062, 1070 (Del. 2012); *accord Chase*, 780 A.2d at 1127–28.  Both constructions, however, must be *reasonable*.  The goal of the Court is "not [to] rewrite an insurance policy [or to] ignore its clear and certain terms," *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 928 (Del. 1982), but rather to give meaning to the objective record of the parties' intent.  As a result, where an *actual* ambiguity exists, courts should say so.  But, at the same time, they should not "destroy or twist policy language under the guise of construing it."  *O'Brien*, 785 A.2d at 288; *accord Chase*, 780 A.2d at 1127–28.  Thus, if the Court concludes that the contract language is unambiguous, the analysis ends, and the insurance contract "should be given 'its ordinary and usual meaning.'"  *O'Brien*, 785 A.2d at 288 (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)); *accord Travelers Indem. Co. v. Workers Int'l Union*, 770 A.2d 978, 985–86 (D.C. 2001).  If ambiguity does exist, however, the Court must proceed to the second step.

At the second step, both Delaware and D.C. courts apply interpretive rules designed to favor the insured.  Both jurisdictions, for example, maintain that "where an ambiguity does exist, the doctrine of *contra proferentem* requires that the language of an insurance policy be construed most strongly against the insurance company that drafted it." *O'Brien*, 785 A.2d at 288; *accord Cameron v. USAA Prop. & Cas. Ins. Co.*, 733 A.2d 965, 968 (D.C. 1999).  And both jurisdictions hold that the policy must be construed in accord with the "reasonable expectations"

16

of the insured.  *Hallowell*, 443 A.2d at 926–27; *accord Chase*, 780 A.2d at 1131–32.  The

parties, however, dispute the extent to which these doctrines apply here and the extent to which

the Court may also consider extrinsic evidence at this stage.  *See* Dkt. 45 at 22–33; Dkt. 51 at

10–13.  Because the Court concludes that the contractual language is unambiguous, it need not

resolve these issues.

Finally, once the meaning of the contract is settled, the burden falls on the insurer to

prove facts sufficient to demonstrate that the asserted exclusion applies.  *Nat'l Grange Mut. Ins.*

*Co. v. Elegant Slumming, Inc.*, 59 A.3d 928, 932 n.18 (Del. 2013); *accord Cameron*, 733 A.2d at

969.

3.      *Plaintiffs' Asserted Ambiguities*

a.      The Meaning of "Unoccupied"

The parties first dispute whether, at the time of the incident, the residence was

"unoccupied" within the meaning of the ML-508D exclusion.  *See* Dkt. 36-1 at 20–23; Dkt. 40 at

19–23.  The relevant facts are not in dispute: no person was present at the property for the six

consecutive days preceding the discovery of the loss.  According to Plaintiffs, however, their

temporary absence does not mean that the house was "unoccupied."  Rather, in their view, the

contractual term "unoccupied" should be given its dictionary meaning, which they say is

"vacant" or "empty."[8]  Dkt. 36-1 at 21.  Finally, they argue that the house was not "vacant" or

"empty" because their belongings remained in the house and they had every intention of

returning.  *Id.*

---

[8]  Plaintiffs appear to take their definition from *Webster's New World Dictionary* (Prentice Hall
2d ed. 1986), portions of which were used at deposition.  *See* Dkt. 40-20 (Ackley Dep. 62:9–
62:22).

The Court is unpersuaded by this interpretation of the exclusion.  Read in context, the word "unoccupied" is unambiguous.  Indeed, the exclusion contains a parenthetical that expressly defines the disputed term: the exclusion applies if the residence is "vacant, unoccupied *(meaning an absence of 72 hours)*, or under construction and unoccupied."  Dkt. 40-21 at 30 (emphasis added).  The word "absence" in that phrase can only be reasonably read to refer to the absence of *people* (as opposed to the absence of furniture, food, and other personal effects).  Plaintiffs' contention that the house was not "unoccupied" because they did not leave it "empty" without an intent "to return," Dkt. 45 at 19, contradicts this plain meaning.

Plaintiffs' interpretation is further flawed in that it would render the term "unoccupied" surplusage.  The ML-508D exclusion applies if the residence is "vacant" *or* "unoccupied."  Dkt. 40-21 at 30.  But, if Plaintiffs are right that "vacant" *means* "unoccupied," Dkt. 36-1 at 21, the terms become altogether redundant.  *See O'Brien*, 785 A.2d at 287 ("[A]n interpretation that gives effect to each term of an agreement is preferable to any interpretation that would result in a conclusion that some terms are uselessly repetitive.").  That redundancy is avoided if "vacant" is construed to refer to a prolonged state of disuse of the kind Plaintiffs envision, and "unoccupied" is construed to refer to a period during which people are absent from the property for seventy-two hours or more.

And, although courts ought not contort contractual terms simply to avoid surplusage, even without a special attempt to give each term independent meaning, the Court would still conclude that this construction of the relevant terms best comports with accepted usage.  *See Myers v. Merrimack Mut. Fire Ins. Co.*, 788 F.2d 468, 471 (7th Cir. 1986) ("'[V]acant' means entirely empty (*i.e.,* lack of animate or inanimate objects), while 'unoccupied' means the lack of habitual presence of human beings (*i.e.,* lack of animate objects).  This construction has been

followed by . . . numerous courts in many . . . jurisdictions."); *see also Webster's Third New International Dictionary, Unabridged* (online ed. 2016) (defining "unoccupied" as "not occupied by inhabitants," or "premises on which no one is living although the furniture and fixtures have not been removed"). The Court, accordingly, concludes that "unoccupied" unambiguously refers to the absence of people for more than seventy-two hours.[9]

The two cases cited by Plaintiffs do not counsel otherwise. The first case, *Chowdhury v. LMI Insurance Co.*, 107 F.3d 6, 1997 WL 54453 (3d Cir. 1997) (unpublished), applied Pennsylvania law and dealt with a contract lacking an express definition of "unoccupied." *Id.* at *3. The second case, *Windsor-Mount Joy Mutual Insurance Co. v. Jones*, No. CIV.A. 07C-07-006THG, 2009 WL 3069695 (Del. Super. Ct. July 17, 2009), if anything, supports *Windsor's* interpretation. In that case, the court considered the meaning of the term "vacant"—rather than the *less* permanent term "unoccupied"—but nonetheless concluded that "the lack of a day-to-day resident at an insured property renders that property vacant . . . notwithstanding the household contents [or] . . . sporadic entry." *Id.* at *4–5. This is precisely the interpretation Plaintiffs seek to avoid. In reaching this conclusion, moreover, the Delaware court distinguished *Chowdhury*, *id.* at *5, and explained why a contrary interpretation would counteract the clear purpose of the contract:

> Any reading of the contract results in the conclusion that the purpose of the provision in question is to protect the insurance company from the increased risk that accompanies insuring a house that does not have an occupant. Plaintiff's assertion that a structure must be wholly empty for the provision to take effect is therefore unpersuasive. . . . [A] fully furnished house would never be considered to

---

[9] The Court has no occasion to decide whether periodic "checking in" on the residence might render it "occupied," given that McCann's latest check-in occurred more than seventy-two hours prior to the discovery of the loss. Nor does the Court address whether Windsor's gloss on "occupancy" in the accompanying notice would be admissible to resolve that issue. *See* Dkt. 40-21 at 30 (interpreting "occupancy" to mean "that someone stays there overnight").

> be vacant [or unoccupied], even if no person entered the house for years, simply because the furniture in the house prevented the structure from being "completely empty."

*Id.* (quoting *Vushaj v. Farm Bureau Gen. Ins. Co.*, 773 N.W.2d 758, 760 (Mich. Ct. App. 2009)).

Finally, Plaintiffs' appeal to the "reasonable expectations" doctrine, *see* Dkt. 36-1 at 23, is also unavailing.  As explained above, that doctrine applies "only after a determination that an insurance contract is ambiguous."  *Stoms v. Federated Serv. Ins. Co.*, 125 A.3d 1102, 1108 (Del. 2015); *accord Chase*, 780 A.2d at 1132.  Plaintiffs' argument thus has no purchase here, where the contract includes a definition of "unoccupied" that is "clear and unambiguous." *Chase*, 780 A.2d at 1132.

As a result, the Court must apply the plain language of the contract.  That language, in conjunction with the undisputed facts, establishes that the residence was "unoccupied" at least between McCann's departure on February 10, 2013, and Dahlgren's arrival on February 16, 2013—a six-day period during which no person was present at the property.

### b.      The Lack of a Water Shutoff Valve

Plaintiffs next argue that the requirement that the insured "must . . . shut off the water supply where it enters the residence" is also ambiguous.  Dkt. 40-21 at 30; *see* Dkt. 36-1 at 23–26; Dkt. 45 at 33–35.  According to Plaintiffs, it is unclear whether this clause applies to residences, like theirs, which lack "shut off valve[s]" at the point the water supply enters the home.  Dkt. 36-1 at 23.  In support of this purported ambiguity, Plaintiffs point to the apparent disagreement among Windsor's agents regarding whether the requirement should apply under

these circumstances,[10] *see* Dkt. 36-1 at 23–26, and argue that these "reasonable disagreement[s]" reveal "ambiguity," which "must be resolved in favor of the insured," *id.* at 26.

Plaintiffs' argument fails, however, because it hinges on evidence irrelevant at this stage of the analysis. When assessing whether contract language is ambiguous, Delaware courts "must confine themselves to the language of the document" and do "not . . . look to extrinsic evidence to find ambiguity." *O'Brien*, 785 A.2d at 289. Similarly, D.C. courts may not "resort[]" to "[e]xtrinsic evidence of the parties' subjective intent," unless the document is ambiguous on its face. *Interstate Fire & Cas. Co. v. Washington Hosp. Ctr. Corp.*, 758 F.3d 378, 383 (D.C. Cir. 2014) (quoting *Sears v. Catholic Archdiocese*, 5 A.3d 653, 661 n.15 (D.C. 2010)); *accord Abdelrhman v. Ackerman*, 76 A.3d 883, 888 (D.C. 2013) ("[E]xtrinsic or parol evidence . . . is inadmissible to vary or contradict the terms of a valid, and plain and unambiguous, written contract."). It follows that, in either jurisdiction, the opinions of Windsor's adjusters, staff and management are not probative of ambiguity.

Recognizing this principle, Plaintiffs argue that these opinions are admissible not as "evidence of the parties' intent," but as "evidence . . . that reasonable persons can disagree about the interpretation and application of the ML508D endorsement." Dkt. 45 at 35. The Court, however, remains unconvinced. Delaware law clearly proscribes such a use. In *O'Brien v. Progressive Northern Insurance Co.*, 785 A.2d 281 (2001), for example, the Supreme Court of Delaware declined to consider even disagreements as to the meaning of the policy among other courts—let alone disagreements among a defendant's employees. *Id.* at 289. And *O'Brien*

---

[10]  It is not clear from the record whether Windsor's agents expressed views about the meaning of the contract, as opposed to views about the contract's reasonableness, fairness, or advisability. The Court, nonetheless, will credit Plaintiffs' interpretation of the facts for purposes of the summary judgment motions.

specifically rejected the contention that an insurer's "internal documents"—which constitute

extrinsic evidence—could "support [a] claimed ambiguity." *Id*.  D.C. law, although perhaps less

emphatic, is nonetheless clear: ambiguity is to be judged by objective standards and does not

exist "merely because the parties disagree" on the proper interpretation.  *Beck v. Cont'l Cas. Co.*

*(In re May)*, 936 A.2d 747, 751 (D.C. 2007).  In short, the existence of ambiguity is a question of

law for the Court, to be ascertained from the four corners of the contract.  To the extent that

Windsor's employees and contractors held views about the meaning of the policy's language,

those views are immaterial in the absence of a genuine ambiguity in the exclusion.[11]

The Court must therefore determine whether the phrase "shut off the water supply where

it enters the residence" is ambiguous as used in the exclusion.  Because the policy nowhere

defines "shut off," the Court begins with the dictionary.  *See, e.g.*, *Interstate Fire & Cas.*, 758

F.3d at 383–84 (collecting D.C. cases); *First Health Settlement Class v. Chartis Speciality Ins.*

*Co.*, 111 A.3d 993, 1005 (Del. 2015).  According to *Webster's*, the transitive verb "to shut off"

means "to cut off (as a flow or passage or something flowing or passing)" or "[to] stop."

*Webster's Third New International Dictionary, Unabridged* (online ed. 2016).  This is the plain

meaning the Court must give the exclusion: coverage is conditioned on the nonoccurrence of an

---

[11]  Windsor would take the rule a step further and bar the Court from considering even the fact that the residence lacks a water supply shutoff valve.  *See* Dkts. 40 at 23–25; 51 at 16–17 (arguing that extrinsic evidence is inadmissible to reveal certain "latent ambiguities").  Although there is plausible support for this idea under Delaware law, *see O'Brien*, 785 A.2d at 289; *Motors Liquidation Co. v. Allianz Ins. Co.*, No. N11C-12-022, 2013 WL 7095859, at *4 (Del. Super. Ct. Dec. 31, 2013), the District of Columbia has expressly rejected it, *see Sahrapour v. Lesron, LLC*, 119 A.3d 704, 708 n.2 (D.C. 2015) (citing *Mitchell v. Meriam*, 188 F.2d 42, 44 (D.C. Cir. 1951) ("How can we tell whether a [document] is clear and definite or ambiguous and uncertain until we know the surrounding facts?")).  Because the contested language is unambiguous even under D.C. law's more permissive standard, the Court does not decide the issue.

event within Plaintiffs' control—namely, that no water will "flow" or "pass" into the residence, or, put differently, that the flow of water must "stop."

Plaintiffs articulate no alternative reasonable interpretation that would render the policy ambiguous. *See Chase*, 780 A.2d at 1127–28. Indeed, beyond the conclusory assertion that "a reasonable reading . . . [would] afford[] coverage to the insured," Dkt. 36-1 at 26, Plaintiffs never identify what their preferred reading is, *see id.* at 23–26. As best this Court can tell, Plaintiffs would have the Court graft onto the exclusion a clause along the following lines: "This exclusion applies only if the house has a shutoff valve." But this limitation finds no support in the policy's plain language, which requires only that the water be "shut off," without regard for how the shutoff is accomplished. The Court has no power to invent such a limitation. *See, e.g.*, *O'Brien*, 785 A.2d at 288; *accord Chase*, 780 A.2d at 1127–28.

Plaintiffs assert that they "are not arguing the lack of a water shut off value shows that the ML-508D exclusion is ambiguous," but "that the lack of a water shut off valve means they did everything they needed to do under the ML-508D endorsement." Dkt. 45 at 33. The Court is, once again, unconvinced. As an initial matter, the Court cannot determine whether Plaintiffs did everything "they needed to do" under ML-508D without construing the exclusion. And, because the Court concludes that the exclusion applies whenever the residence is unoccupied for seventy-two hours or more and the insured does not "shut off the water supply," it is incorrect to assert that Plaintiffs did everything required under ML-508D.

But, even if Plaintiffs' argument is not merely circular, and they intend to argue that they did everything they reasonably could have done, the Court is unpersuaded. First, it is uncontested that Plaintiffs could have hired a plumber to install a shutoff valve for approximately $815. Dkt. 40-10 at 4. Although it may have been impractical to do so on short notice, the

relevant limitation was in effect for more than six years prior to the incident, Dkt. 40 at 15, so Plaintiffs had ample opportunity to do so.  Second, it is incorrect to suggest that the exclusion merely required Plaintiffs to close their (nonexistent) shutoff valve.  Indeed, the policy makes no mention of a "shutoff valve," but, rather, requires that the homeowner "shut off the water supply."  Dkt. 40-21 at 30.  A shutoff valve is just one means of doing so.  "Shutting off" might equally have been achieved by, for example, requesting that the city turn off the house's water supply at the point it reaches the house.  And, third, the exclusion does not even require that the homeowner "shut off the water supply."  The insured can maintain coverage for damage caused by a leaking or broken pipe, for example, by arranging for a house sitter if the homeowner plans to be away for more than seventy-two hours.  None of this is easy, but the unambiguous terms of the exclusion gave Plaintiffs a choice: they either could take one of these steps or could bear the risk that a potentially catastrophic water leak would occur when no one was present to minimize the damage.

Plaintiffs' briefs do include some gestures towards areas of contract law other than ambiguity.  For example, one heading in their opening brief claims that the shutoff requirement has been "excused or waived."  Dkt. 36-1 at 23.  That brief also makes a passing reference to "impossib[ility]," *id.*, and implicitly suggests that the shutoff requirement is "unreasonable," *id.* at 24 (quoting Dkt. 36-13 at 3 (Stapf's draft report)).  Plaintiffs echo such language sporadically throughout their reply brief.  *See* Dkt. 45 at 33–36.  They offer no argument or legal authority, however, to support any of these vague, conclusory references.  As a result, Plaintiffs have not properly raised these arguments.  *See Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001) (per curiam) ("A litigant does not properly raise an issue by addressing it in a

'cursory fashion' with only 'bare-bones arguments.'" (quoting *Wash. Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 39 (D.C. Cir. 1997))).

The Court, accordingly, concludes the policy's shutoff requirement is unambiguous. There is no need to weigh the extrinsic evidence of the party's intent at the time of contracting (*e.g.*, the WB-27D notice), or to consider the rules that favor the insured in construing ambiguities in insurance policies (*e.g.*, *contra preforentum*).

c.    <u>The Scope of the Exclusion</u>

Plaintiffs' third assertion of ambiguity concerns the scope of the ML-508D exclusion. Plaintiffs contrast form ML-508D with the three types of exclusions found in the policy's Special Form.  Some of the Special Form exclusions contain clear, specific language regarding (1) whether they exclude risks to both real and personal property, or to real property alone; (2) whether they exclude "ensuing losses" in addition to the excluded risk; and (3) whether they employ an "anti-concurrent" causation test.  *See supra* notes 3–5 and accompanying text. Although Plaintiffs' brief is not entirely clear, it appears to argue that, because the ML-508D exclusion lacks similarly explicit language, it is ambiguous with respect to each of these three issues.  *See* Dkt. 36-1 at 26–29; Dkt. 45 at 36–38.  The Court considers each issue in turn.

As to the first issue, the Court concludes that the ML-508D exclusion unambiguously excludes coverage of damage to both real and personal property.  Form ML-508D states that, if the homeowner leaves the insured residence unoccupied for more than seventy-two hours and fails to shut off the water, as occurred here, Windsor "do[es] not pay for loss" if that loss is "caused by . . . overflow from any plumbing . . system."  Dkt. 40-21 at 30.  That statement is unequivocal.  If the specified conditions exist, Windsor will not pay for the loss.  In Plaintiffs' view, the fact that the exclusion does not specify whether it applies to losses to real property,

personal property, or both necessarily injects an ambiguity in the provision.  They note, for

example, that the first category of Special Form exclusions expressly cabins itself to "Coverages

A and B" (*i.e.*, coverages of real property but not personal property), *see* Dkt. 40-21 at 6, 12, and

that ML-508D lacks similar clarity.  But, the absence of a limitation does not mean that the

exclusion is ambiguous; it means it is comprehensive.  An exclusion that applies to "cars," for

example, is not ambiguous because it does not specify whether it applies to "red cars," "green

cars," or both—even if other provisions in the policy may apply only to "red" or "green cars."

The same is true here.  ML-508D, thus, more closely resembles the second and third Special

Form exclusions, which are denominated broadly as "EXCLUSIONS THAT APPLY TO

PROPERTY COVERAGES," Dkt. 40-21 at 15, without further defining their reach with

reference to additional subcategories of coverage.  The Court, accordingly, concludes that the

fact that the exclusion applies to losses, without specifying whether it applies to losses to both

real and personal property, does not create an ambiguity.

   As to the second issue, the Court concludes that form ML-508D also makes no exception

for "ensuing losses."  In this respect, ML-508D differs from the third type of Special Form

exclusion, which expressly includes such an exception:

> [We] do not pay for loss if one or more of the following exclusions apply to the
> loss.  *However, [we] do pay for an ensuing loss that is otherwise covered by the*
> *policy.*

Dkt. 40-21 at 16 (emphasis added).  If similar language applied here, loss from the initial peril—

the burst pipe—might arguably be analyzed separately from the "ensuing loss[es]" caused by

mold.  The policy might cover one but not the other.  *See generally* 5 Jeffrey E. Thomas, *New*

*Appleman on Insurance Law* § 44.05 (Library ed. 2015) ("An ensuing loss is generally one

which follows from a loss caused by an excluded peril and which may be brought within

coverage depending on the wording of the policy's ensuing loss clause."). But the ML-580D exclusion, like the first two Special Form exclusions, has no "ensuing loss" clause. It states only that Windsor "do[es] not pay for loss caused by . . . overflow from any plumbing . . . system"— and that is it. Dkt. 40-21 at 30. Again, the absence of a limitation in ML-508D does not create an ambiguity regarding the reach of the provision; rather, it means that the provision is unambiguously comprehensive.

As to the third issue, the Court concludes that the meaning of "cause" in ML-508D is not ambiguous in any relevant respect. Plaintiffs appear to argue that the exclusion is ambiguous as to how it treats instances of multiple causation—that is, situations in which both a covered and a noncovered peril contribute to the loss. *See generally* 7 Steven Plitt et al., *Couch on Insurance* § 101:53 (3d ed. 2013). According to Plaintiffs, the Court should construe this ambiguity in favor of Plaintiffs and apply the doctrine of "efficient proximate cause." Dkt. 36-1 at 27; Dkt. 45 at 37. Under that doctrine, where multiple perils contribute to the loss, coverage is determined by whichever peril is the "efficient proximate cause," *i.e.*, the "dominant" cause, or "the one that necessarily sets the other causes in operation." *Chase*, 780 A.2d at 1130; *accord* 7 Plitt et al., *supra*, § 101:55. If the efficient proximate cause is a covered peril, the loss is covered; if the efficient proximate is a noncovered peril, the loss is not covered. *Chase*, 780 A.2d at 1130. Here, Plaintiffs identify the causal chain leading up to the loss as "(1) a suddenly breaking pipe, (2) water escaping into the home, and (3) the proliferation of mold," Dkt. 45 at 37, although the first two events are properly considered a single peril, rather than two, *see Chadwick v. Fire Ins. Exch.*, 21 Cal. Rptr. 2d 871, 875 (Cal. Ct. App. 1993).[12]

---

[12]  Plaintiffs also omit from their causal chain Gale Force's alleged negligence and Plaintiffs' own decision to demolish the house. Because Plaintiffs do not raise those events as reasons why the loss would not be excluded under ML-508D, the Court does not consider them.

But, even assuming that the "efficient proximate cause" doctrine applies, it is undisputed that the "cause that set the other causes in operation" was the broken pipe. Indeed, Plaintiffs themselves allege—without qualification—that "[t]he proximate cause of the loss was the hot water supply pipe's failure and separation," and that the pipe's failure "allowed water and steam to enter the [h]ome causing loss and damage which resulted in a total loss of the home and its contents." Dkt. 35 at 3 (Am. Compl. ¶¶ 12–13). Plaintiffs confirm in their opposition, moreover, that "it is undisputed that the damage claimed by the Plaintiffs was caused by the separation of a plumbing fixture." Dkt. 45 at 37. Thus, there is no genuine factual dispute that the "efficient proximate cause" of Plaintiffs' loss was the broken pipe and resulting overflow—a peril excluded under ML-508D. *See* Dkt. 40-21 at 30.

Rather than dispute the underlying facts, Plaintiffs argue that ML-508D does not apply because it "does not unambiguously exclude pipe separation, water loss resulting from the pipe separation[,] or ensuing mold damage." Dkt. 40 at 37. The Court is unpersuaded for two reasons. First, ML-508D *does* unambiguously exclude the "pipe separation" and the resulting "water loss." The exclusion's text is clear: Windsor "do[es] not pay for loss caused by . . . discharge, leakage, or overflow from any plumbing . . . system." Dkt. 40-21 at 30. Second, under Plaintiffs' theory, there is no requirement that ML-508D expressly exclude the proliferation of mold. As explained above, the "efficient proximate cause" doctrine applies "when a covered *and* a noncovered peril contribute to a loss." *Chase*, 780 A.2d at 1129–30 (emphasis added). Even if mold is a covered peril, because it is undisputed that the broken pipe is the "efficient proximate cause" of the loss, it is the broken pipe's coverage status that controls. And, under the plain language of ML-508D, the broken pipe is not covered. Dkt. 40-21 at 30. It follows that Plaintiffs' entire loss is not covered, either.

Finally, Plaintiffs assert, in an apparent *non sequitor*, that ML-508D should be read to exclude only the damage to the pipe itself, as opposed to damage from the resulting flood or mold.  Dkt. 36-1 at 29; Dkt. 45 at 36.  This suggestion is inconsistent with the exclusion's plain language and is in no way compelled by the "efficient proximate cause" doctrine.

*   *   *

In sum, the Court concludes that ML-508D is unambiguous.  The undisputed facts, moreover, show that the residence was "unoccupied" at the time the incident occurred.  Plaintiffs were required to "shut off the water supply" before they left their residence, but failed to do so.  And under these facts, ML-508D excludes coverage for loss of any of Plaintiffs' real or personal property at the residence.  The Court, accordingly, will deny Plaintiffs' motion for partial summary judgment and will grant summary judgment in favor of Windsor.

**B.**      **Gale Force's Motion to Dismiss the Amended Complaint**

1.      *Personal Jurisdiction Over Gale Force*

In addition to seeking to recover from Windsor for breach of the insurance contract, Plaintiffs assert claims against Gale Force for breach of contract, negligent misrepresentation, negligence, and violation of the Delaware Consumer Protection Act.  Dkt. 35 at 6–12.  Each of these claims rests on the allegations that Gale Force promised to take steps to remediate the water damage to Plaintiffs' home but failed to do so.  *Id.*  Gale Force, in turn, has moved to dismiss the amended complaint for lack of personal jurisdiction.  Dkt. 42-1.  For the reasons explained below, the Court agrees that it lacks personal jurisdiction over Plaintiffs' claims against Gale Force.

"To establish personal jurisdiction over a non-resident, a court must engage in a two-part inquiry."  *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000).

It must first consider "whether jurisdiction is applicable under the state's long-arm statute," and it must "then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process." *Id.*  The courts and governing statutes typically "differentiate between" two types of personal jurisdiction—"general or all-purpose jurisdiction, and specific or case-linked jurisdiction." *Goodyear Dunlop Tires Ops. v. Brown*, 564 U.S. 915, 919 (2011).  Given the demanding requirements for establishing general jurisdiction, however, Plaintiffs contend only that the Court has specific jurisdiction over their claims against Gale Force.  *See* Dkt. 49 at 6.

"Specific jurisdiction" exists in cases in which "the suit 'aris[es] out of or relate[s] to the defendant's contacts with the forum.'" *Goodyear Dunlop*, 564 U.S. at 919 (quoting *Helicopteros Nacionalies de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)).  Under D.C. law, specific jurisdiction exists with respect to "claim[s] for relief arising from" various activity engaged in by the defendant in the District or causing injury in the District.  D.C. Code § 13-423.  As relevant to Plaintiffs' theories of jurisdiction, the D.C. long-arm statute requires that the claim arise from the defendant's (1) "transacting any business in the District of Columbia," § 13-423(a)(1), or (2) "causing tortious injury in the District of Columbia by an act or omission in the District of Columbia," § 13-423(a)(3).

a.   "Transacting Business" in the District

In construing section 13-423(a)(1), the D.C. Court of Appeals has given the phrase "transacting business" "'an expansive interpretation' that is 'coextensive with the due process clause.'" *Helmer v. Doletskaya*, 393 F.3d 201, 205 (D.C. Cir. 2004) (quoting *Mouzavires v. Baxter*, 434 A.2d 988, 992 (D.C. 1981)).  The relevant question, then, is whether Gale Force has "purposefully established minimum contacts" with the District of Columbia, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985), "such that [it] should reasonably [have] anticipate[d]

being haled into court" here, *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297

(1980).  That is, Plaintiffs must be able to show that Gail Force "purposefully avail[ed] itself of

the privilege of conducting activities within [the District of Columbia], thus invoking the benefits

and protections of its laws."  *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

Plaintiffs identify the following "contacts" between Gale Force and the District of

Columbia, which they contend are sufficient to establish "transacting business" jurisdiction: (1)

Gale Force knowingly entered into a contract with Plaintiffs, whom Gale Force knew at the time

to be D.C. residents; (2) Gale Force communicated by telephone and email with Plaintiffs about

that contract while Plaintiffs were in the District of Columbia; and (3) Gale Force "has some sort

of marketing presence or business relationship in D.C. through its 1-800-BoardUp franchise or

marketing model."  Dkt. 49 at 4–5, 8–9.  None of these contacts is sufficient to confer specific

personal jurisdiction over Gale Force.

*First*, the contract between Gale Force and Plaintiffs does not reach the level of

"minimum contacts" with the District.  It is well settled that merely entering into a contract with

an out-of-state party does not constitute the kind of "purposeful availment" that subjects a

defendant to the laws of the other party's home state.  *Burger King*, 471 U.S. at 478; *Thompson

Hine, LLP v. Taieb*, 734 F.3d 1187, 1190, 1191–92 (D.C. Cir. 2013); *Helmer v. Doletskaya*, 393

F.3d 201, 205 (D.C. Cir. 2004).  Rather, the contract itself must have a "substantial connection"

to the forum, *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957), as determined by "prior

negotiations and contemplated future consequences, along with the terms of the contract and the

parties' actual course of dealing," *Burger King*, 471 U.S. at 479.  "Where the contract was

'neither made nor performed in the District, and no services were provided or to be provided

here,' the contract does not justify the exercise of personal jurisdiction over the non-resident

defendant." *Exponential Biotherapies, Inc. v. Houthoff Buruma N.V.*, 638 F. Supp. 2d 1, 7–8

(D.D.C. 2009) (quoting *COMSAT Corp. v. Finshipyards S.A.M.*, 900 F. Supp. 515, 524 (D.D.C.

1995)); *accord Geier v. Conway, Homer & Chin-Caplan, P.C.*, 983 F. Supp 2d 22, 33 (D.D.C.

2013).

Here, the contract between Gale Force and Plaintiffs lacks any substantial connection to

the District of Columbia.  Plaintiffs solicited Gale Force in Delaware for the one-time

remediation of water damage at Plaintiffs' Delaware home.  The contract was formed and

executed in Delaware.  The contract was to be performed entirely in Delaware.  Gale Force's

agents never left Delaware in connection to the contract, and neither party contemplated that the

contracted-for services would occur anywhere but Delaware.  Indeed, the sole connection

between the terms of the contract and the District of Columbia is that Plaintiffs' "billing address"

happened to be in D.C.  But this is nothing more than an acknowledgment that Plaintiffs were

D.C. residents—a fact insufficient to establish personal jurisdiction.  *See Thompson Hine*, 734

F.3d at 1193.  Because the law is clear that "a contract with a resident of a forum does not by

itself establish minimum contacts with that forum," *Helmer*, 393 F.3d at 206 (construing *Burger

King*, 471 U.S. at 478), the contract does not establish minimum contacts.

*Second*, the fact that Gale Force exchanged telephone calls and emails with Dahlgren

while she was in the District does not constitute "transacting business" there.  "[E]mail and

telephone communications sent into the District of Columbia are not sufficient to [confer

personal jurisdiction] in themselves, even if they are made pursuant to an underlying contract

between a resident [plaintiff] and a nonresident [d]efendant."  *Associated Prods., Ltd v.

Vanderbilt Univ.*, 76 F. Supp. 3d 154, 165 (D.D.C. 2014).  "After all, such communications are

incidental to nearly every business relationship; they are not indicative of any desire to do

business in D.C. and do not suffice to show purposeful availment or minimum contacts."
*Exponential Biotherapies*, 638 F. Supp. 2d at 9.

Gale Force apparently made just four telephone calls to Dahlgren in the District of
Columbia, Dkt. 48-1 at 4, received a handful of additional calls from her, *id.*, and engaged in two
email exchanges with her, *see* Dkt. 48-11.  All of these communications occurred for the purpose
of implementing a contract that the Court has already determined is substantially unrelated to the
District of Columbia.  Gale Force contacted Plaintiffs in the District only because Plaintiffs
"happened to be located" there.  *Gibbons & Co. v. Roskamp Inst.*, No. 06-cv-720, 2006 WL
2506646, at *3 (D.D.C. Aug. 28, 2006).  "Such 'contact' does not constitute a deliberate and
voluntary association with the District that rises to the level of [minimum contacts]."  *Id.*

The telephone calls and emails in this case, moreover, are *de minimis*.  Communications
far more substantial than Gale Force's have been held insufficient to constitute "transacting
business" under section 13-423(a)(1).  *See, e.g.*, *Thompson Hine*, 734 F.3d at 1192 (exchange of
"at least ten emails" insufficient); *Exponential Biotherapies*, 638 F. Supp. 2d at 5, 9 (law firm's
transmission into D.C. of legal invoices, work product, and demands for payment insufficient);
*Jung v. Ass'n of Am. Med. Colleges*, 300 F. Supp. 2d 119, 131 (D.D.C. 2004) (ten
communications per year insufficient); *COMSAT Corp.*, 900 F. Supp. at 524 (eleven faxes and
phone calls insufficient); *Textile Museum v. F. Eberstadt & Co.*, 440 F. Supp. 30, 31–32 (D.D.C.
1977) (seventy-four instances of mailed correspondence insufficient); *Gibbons & Co.*, 2006 WL
2506646, at *3 (fifty to seventy-five phone calls and emails insufficient); *see also FC Inv. Grp.
LC v. HFX Mkts., Ltd.*, 529 F.3d 1087, 1095 n.8 (D.C. Cir. 2008) (collecting cases).

*Third*, Gale Force's connection to BoardUp cannot create specific personal jurisdiction in
this case.  Gale Force's owner, Randy McCreary, testified that BoardUp "is a marketing model"

to sell restoration services across different geographic areas.  Dkt. 52-7 at 3 (Supp. McCreary Decl. ¶¶ 3, 4).  As he explained the relationship, Gale Force "purchased a territory" from BoardUp, which allowed Gale Force to do business under the "BoardUp" name in that territory. *Id.* (¶ 5).  BoardUp, in turn, would refer calls to perform work in that territory to Gale Force.  *Id.* At the relevant time, Gale Force's "territory" included parts of Delaware and Maryland, but not the District of Columbia.  *Id.*  As a result, according to McCreary, potential projects in the District of Columbia were directed to a different BoardUp franchisee, which had no relation to Gale Force.  *Id.*; *see also* Dkt. 48-4 at 15 (Robert Keefer Dep. 52) (identifying the BoardUp entity in D.C. as a company called "Prompt Restoration").

Plaintiffs dispute this description of the relevant facts.  They note that the "1-800-BoardUp" name appeared on the contract they signed with Gale Force, and they argue that Gale Force maintains a business presence in the District of Columbia through BoardUp.  Dkt. 49 at 7–8.  They also note, moreover, a different Gale Force employee testified that Gale Force and BoardUp are "the same" and that Gale Force "is the parent company to everything."  Dkt. 48-4 at 15 (Robert Keefer Dep. 51, 53).  Although it is possible to reconcile this evidence with McCreary's testimony that Gale Force was only entitled to use the BoardUp brand in the relevant territory—which did not include the District of Columbia—the Court will assume for present purposes of the relevant facts are in dispute.

Yet, even if BoardUp's contacts with the District were attributable to Gale Force, and even if those contacts amounted to "transacting business," they still would not establish specific personal jurisdiction over Gale Force.  To justify the exercise of specific jurisdiction, the claim at issue must "arise from" the asserted contacts with the jurisdiction.  *See* D.C. Code § 13-423(b); *Novak-Canzeri v. Saud*, 864 F. Supp. 203, 206 (D.D.C. 1994).  Plaintiffs, however, were not

"referred" to Gale Force through BoardUp; they contacted Gale Force directly by telephoning Gale Force's Delaware office.  Dkt. 53-1 at 2.  The only telephone calls in the record are calls between Plaintiffs and Gale Force's office in Delaware, or between Plaintiffs and Gale Force's Delaware employees.  *See* Dkt. 48-5.  And neither of Plaintiffs' depositions includes any reference to BoardUp whatsoever.  Dkt. 40-1 (Dahlgren Dep. i4, i6); Dkt. 40-15 at 9 (Katopothis Dep. i1).  Thus, even assuming that BoardUp had other contacts with the District of Columbia, there is no evidence—or allegation—that BoardUp had anything to do with the transaction at issue.

The Court accordingly concludes that Gale Force was not "transacting business" in the District within the meaning of section 13-423(a)(1).

b.     <u>Tortious Act and Injury in the District</u>

Plaintiffs also assert that the Court has specific personal jurisdiction over Gale Force under D.C. code section 13-423(a)(3).  Dkt. 49 at 5.  That section authorizes the exercise of personal jurisdiction over defendants who "caus[e] tortious injury in the District of Columbia by an act or omission in the District of Columbia."  § 13-423(a)(3).  Unlike the "transacting business" test, section 13-423(a)(3) is "a precise and intentionally restricted [jurisdictional provision] which stops short of the outer limits of due process."  *Moncrief v. Lexington Herald-Leader Co.*, 807 F.2d 217, 221 (D.C. Cir. 1986) (citation omitted).  Under section 13-423(a)(3), "both [the] act and [the] injury [must] occur in the District of Columbia."  *Helmer*, 393 F.3d at 208.  The Court is unconvinced that Plaintiffs' claims satisfy either prong of this test.

For one, the Court doubts the alleged "misrepresentation" should be deemed to have occurred in the District.  The overwhelming locus of relevant acts was in Delaware, and not in the District of Columbia.  That is where the flooded residence was located, where Gale Force

35

was supposed to perform its services, and where Dahlgren met with Gale Force and agreed to engage the company.  In contrast, no employee or agent of Gale Force entered the District of Columbia for any purpose related to this case.  And the only acts that Plaintiffs identify that ever arguably occurred in the District of Columbia are telephone calls made from Delaware to the District of Columbia, during which Gale Force employees allegedly "made false representations . . . concerning their ability and intent to restore the premises."  Dkt. 49 at 2.  The only relevant precedent the Court has been able to locate is contrary to Plaintiffs' theory.  In that case, Judge Flannery held that "two phone calls made by defendant [from outside the District of Columbia] into the District," do not "provide a jurisdictional basis under [D.C. Code section 13-423(a)(3)], even assuming that fraudulent misrepresentations were made by defendant to plaintiff during those conversations."  *Sec. Bank, N.A. v. Tauber*, 347 F. Supp. 511, 516–17 (D.D.C. 1972).  At least on the facts of this case, it is farfetched to suggest that a handful of telephone calls and emails were sufficient to shift the locus of the alleged tortious act from Delaware to the District.

The Court need not, however, rest its decision on the locus of the allegedly tortious *act* because it is clear that the alleged *injury* did not occur in the District of Columbia.  Plaintiffs contend that Gale Force failed to take "the necessary steps to remediate, stop, restore, repair and abate the damage to" their Delaware home and its contents.  Dkt. 35 at 8 (Am. Compl. ¶ 46).  That injury, of course, occurred in Delaware—not in the District of Columbia.  And although Gale Force's actions may have affected Plaintiffs' finances, the D.C. Circuit has rejected the contention that "economic injury" occurs for purposes of D.C. Code section 13-423(a)(3) "at the plaintiff's domicile."  *Helmer*, 393 F.3d at 208.  Nor did the "injury" occur in the District of Columbia merely because a Gale Force employee allegedly made false representations to

Dahlgren over the telephone while she was in the District.  *See id.* (finding it insufficient that plaintiff "fraudulently concealed her personal background during her visit to the District of Columbia").  What matters is where the injury occurred and that was in Delaware, where mold infested Plaintiffs' home due to Gale Force's alleged failure to remediate the water damage.[13] The Court, accordingly, concludes that D.C. Code section 13-423(a)(3) does not provide a basis for asserting personal jurisdiction over Gale Force in this matter.

2.     *Jurisdictional Discovery*

The Court also rejects Plaintiffs' request that they be permitted to take further jurisdictional discovery.  It is, of course, true that "if a party demonstrates that it can supplement its jurisdictional allegations through discovery, then jurisdictional discovery is justified."  *GTE New Media Services, Inc.*, 199 F.3d at 1351.  To justify a request for further jurisdictional discovery, however, "the plaintiff 'must have at least a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the defendant,'" and that belief must be more than "conjecture or speculation."  *FC Inv. Grp. LC*, 529 F.3d at 1093–94 (quoting *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC,* 148 F.3d 1080, 1090 (D.C. Cir. 1998)).  Here, Plaintiffs have failed to offer such a justification.

As an initial matter, the Court notes that Plaintiffs have already had an opportunity to engage in substantial discovery, including taking the depositions of at least three Gale Force employees.  *See* Dkts. 49-1, 49-2 & 49-3.  Moreover, they also have personal knowledge regarding many of the jurisdictional facts upon which they rely.  Dahlgren, for example, was a

---

[13]  Plaintiffs do not argue that part of their injury included a fraudulently induced payment to Gale Force for the services it failed to provide.  The complaint does not include any such allegation, and Plaintiffs' opposition to Gale Force's motion to dismiss merely asserts that "payments *if* made by the Plaintiffs *would* come from D.C."  Dkt. 49 at 2 (emphasis added); *see also id.* at 7 ("performance by the Plaintiffs *would be* by payment from D.C." (emphasis added)).

party to the telephone and email communications with Gale Force, yet she has not offered a declaration recounting the content of those communications.

Plaintiffs, moreover, have failed to identify any unknown jurisdictional facts that are material to the Court's decision.  They seek, for example, to depose McCreary regarding the relationship between Gale Force and BoardUp.  Dkt. 49 at 9.  But, as explained above, even if BoardUp's activity in the District of Columbia could be attributed to Gale Force, that would be insufficient to establish specific jurisdiction.  *See supra* pp. 33–35.  Discovery into Gale Force's alleged "misrepresentations" to Dahlgren is likewise immaterial, given the Court's conclusion that D.C. Code section 13-423(a)(3) does not apply.  *See supra* pp. 35–37.  And further discovery relating to the telephone and email conversations from Gale Force into the District is unnecessary for purposes of Plaintiffs' efforts to establish "transacting business" jurisdiction under D.C. Code section 13-423(a)(1), both because these out-of-state telephone calls to the District are alone insufficient to subject Gale Force to the jurisdiction of D.C. courts, *see supra* pp. 32–33, and because Dahlgren was a party to all of those conversations and could readily have provided the Court with any relevant details.

The Court will, therefore, deny Plaintiffs' request for additional jurisdictional discovery.

3.     *Transfer of Venue*

Having concluded that the Court lacks personal jurisdiction over Gale Force, the Court must "dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought [*i.e.*, the District of Delaware]."  28 U.S.C. § 1406(a).  The "congressional purpose underlying section 1406(a) favor[s] the transfer of cases when procedural obstacles 'impede an expeditious and orderly adjudication . . . on the merits.'"  *Sinclair v. Kleindienst*, 711 F.2d 291, 293–94 (D.C. Cir. 1983) (quoting *Goldlawr, Inc. v. Heiman*, 369 U.S.

463, 466–67 (1962)).  Included among these "procedural obstacles" is "the lack of personal jurisdiction."  *Id.* at 294.  "Transfer," moreover, "is particularly appropriate where, . . . without a transfer the cause of action would be barred by the running of the applicable statute of limitations."  *Id.*

In light of the policy favoring transfer, the Court will transfer the action to the U.S. District Court for the District of Delaware.  The events that form the basis for Plaintiffs' claims against Gale Force occurred in February and March 2013.  Under Delaware law, claims for breach of contract, negligence, negligent misrepresentation, and violations of consumer protection statutes are typically governed by a three-year statute of limitations.  *See* Del. Code tit. 10, § 8106.  Accordingly, unless the action is transferred, there is a substantial possibility that Plaintiffs' claims will be barred.  It also "appears that transfer would enable [Plaintiffs] to obtain personal jurisdiction over" Gale Force, *Sinclair*, 711 F.2d at 294, given that Gale Force's President and owner represents that Gale Force is incorporated and maintains its principal place of business in Delaware, Dkt. 42-5 at 2, and that the relevant events occurred in there.  Transfer of the action, accordingly, would "make an adjudication [of] the merits of [P]laintiff[s'] claims possible."  *Sinclair*, 711 F.2d at 294.

## CONCLUSION

Plaintiffs' motion for partial summary judgment, Dkt. 36, will be denied, and Windsor's motion for summary judgment, Dkt. 46, will be granted.  In addition, because the Court lacks personal jurisdiction over Gale Force with respect to Plaintiffs' claims against it, the Court will transfer the action to the U.S. District Court in Delaware pursuant to 28 U.S.C. § 1406(a).

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  September 26, 2016.